2014 VT 116

# Kevin Barrup (Marilyn Barrup, Intervenor) v. Tammy Barrup

[111 A.3d 414]

No. 12-415

Present: **Reiber, C.J., Dooley, Skoglund, Robinson and Crawford, JJ.**[1]

Opinion Filed November 7, 2014

---

[1] Justice Crawford was present for oral argument, but did not participate in this decision.

26

*Bruce C. Palmer* of *Downs Rachlin Martin PLLC*, St. Johnsbury, for Intervenor-Appellee/Cross-Appellant.

*Tammy J. Barrup*, Pro Se, Island Pond, Defendant-Appellant.

¶ 1. **Robinson, J.** The primary issue in this case involves the rights of a divorcing husband's mother whose property interests were purportedly adjudicated in a final divorce decree in an action to which she was not a party. Appellant, former wife Tammy Barrup, appeals an order modifying a final property-division order to account for the recorded interest of her former husband's mother in property that was purportedly divided in the final divorce decree, and also modifying spousal maintenance. Intervenor, former husband's mother Marilyn Barrup, cross-appeals. We affirm.

¶ 2. This has been an acrimonious divorce, with multiple post-judgment motions. The procedural background most relevant to this appeal is as follows. The parties were married in 1986 and separated for the last time in 2004. The Superior Court, Family Division, Orleans Unit issued a final order and decree of divorce in this case in November 2007. The court found that the parties owned, among other things, husband's interest in a closely held family business with his parents, two other businesses run by husband, two residences, and various investments. The court found that "the parties' LPL Financial Services stock and mutual funds (including the CNB [Community National Bank] stock) had a value of approximately \$363,495."[2] The court awarded \$3,250 of

---

[2] The court at this juncture may have thought that the Community National Bank stocks were part of the LPL portfolio, which they were not. The parties actually had two stock accounts at CNB that were not part of the LPL account. One, containing 911.80 shares, was undisputedly owned jointly by husband and wife. The other account, then consisting of 4818.76 shares, is the one in dispute. Unless otherwise indicated, references to the disputed CNB account relate to this latter, disputed account.

these accounts to wife "to reflect her share of a pre-separation disbursement from this account" to husband, and then awarded seventy percent of the remaining funds to wife, while husband received the remaining thirty percent. The court explained that its award of a disproportionate share of these accounts to wife reflected, and to some extent offset, the court's award of his interest in the family business to husband.[3]

¶ 3. With respect to spousal maintenance, the trial court concluded that although the property-division award to wife might meet her reasonable needs in the short term, she would not be able to support herself without exhausting those resources. Considering the parties' respective earning power, the length of the marriage, and wife's reasonable needs, the court ordered husband to pay spousal maintenance to wife in the amount of $12,000 per year, in quarterly installments, until wife reached the age of sixty-two.

¶ 4. Husband filed a motion to amend the judgment, raising a host of issues. The court's final decree included a CNB stock account valued at $59,000 as part of the recitation of the value of the LPL portfolio. Husband argued that this was improper, contending that the CNB account was not marital property subject to distribution. He argued that the evidence presented at trial reflected that the funds in this account came from an inheritance from his grandmother that was to be held by his mother until her death. He had testified that he was not authorized to withdraw funds from the account.

¶ 5. In a January 2008 order, the trial court rejected husband's motion, concluding that the evidence did not support husband's claim that the stock at issue was held in trust or controlled by his mother. To the contrary, the account-holders were identified (presumably in the exhibits) as Kevin and Tammy Barrup, and the value of the account was identified as $96,953. The court's distribution of a stock account allegedly jointly owned by husband and his mother was not one of the various issues raised by husband in his appeal of the final divorce decree and the decision regarding his motion to alter or amend. See *Barrup v. Barrup*,

---

[3] Because the focus of this appeal is the distribution of one particular account, we do not here recount the court's description of or order concerning all of the parties' assets and debts. We discuss *infra* the broader property-division analysis only to the extent it is relevant to the issue in this case.

No. 2010-018, 2010 WL 7799798 (Aug. 18, 2010) (unpub. mem.), https://www.vermontjudiciary.org/UPEO2006-2010/eo10-018.pdf.

¶ 6. Subsequently, wife filed multiple motions to enforce the judgment, including a March 2009 motion for division of marital accounts, and husband filed a motion to modify spousal maintenance. Concerning the property division, husband renewed his contention that one of the two CNB stock accounts was not marital property subject to division. In its November 2009 decision, the trial court revisited the question of which of the CNB accounts were subject to the property distribution in the final divorce decree. The court acknowledged that the CNB accounts were not actually part of the LPL portfolio, which was undisputedly subject to a 70%-30% division pursuant to the express terms of the final order, but concluded that the court's intention in the final divorce decree to subject the CNB accounts to the same 70%-30% split was clear from its prior orders, especially given the valuation assigned to the account that the court ordered to be divided. That the CNB account owned jointly by husband and wife was subject to division was also clear and undisputed.

¶ 7. With respect to husband's argument that the other CNB account was not, in fact, marital property, the court noted that the trial court's order to divide the disputed account (which was not appealed) was a final and binding order of the court not subject to challenge. Moreover, reviewing a bank record that had been admitted at trial, the court concluded that the account in question was held in husband's name, and that "[t]here is absolutely no indication that these shares are held subject to any restriction, or in trust status."[4] This order did not purport to address husband's motion to modify spousal maintenance.

¶ 8. Following this 2009 order, husband's mother moved to intervene pursuant to Vermont Rule for Family Proceedings 4(a)(1) and Vermont Rule of Civil Procedure 24(b)(2), arguing that her property interests were affected by the court's entry orders, that she had not been party to the underlying divorce or post-judgment motions, that she must be allowed to establish her ownership of property over which the court had exercised juris-

---

[4] Husband had, by this time, apparently conveyed his interest in the disputed account back to his mother. The trial court noted that any purported transfer of husband's share to his mother following the final divorce decree would be invalid as in avoidance of lawful orders of the court.

diction, and that she must be afforded due process in connection with the disposition of her property. Husband's mother also raised, on her own behalf, the same argument as husband — that the disputed CNB account was not marital property subject to distribution. In an accompanying motion based on V.R.C.P. 59 and V.R.C.P. 60, husband's mother made the same assertion as husband had made previously — the disputed CNB account was hers — held jointly with husband but subject to her control until her death. The court granted the motion to intervene.

¶ 9. The court held a hearing in August 2012 to address the outstanding issues concerning the disputed account and the enforcement or modification of spousal maintenance.[5] On the first issue, the court concluded that its prior conclusion that there was no evidence that the disputed account was subject to any restrictions or interest of husband's mother was not based on good evidence. Before husband's mother intervened, nobody presented the court with the actual stock certificates or other primary evidence of ownership. The bank account statement referenced by the court in its November 2009 ruling was a "consolidated" bank statement that, in accordance with the bank's convention, simply reflected a person's ownership interest in any assets within the bank's control without purporting to describe how each account was held. By the same token, because he was listed first on the account, husband received the applicable IRS Form 1099-DIV, but that did not mean he was sole owner. In fact, the court found, husband's mother had owned the stocks in the account and put husband's name on the account. At the time of the final divorce hearing, the stocks in the account were titled jointly to husband and his mother, with rights of survivorship.

¶ 10. The court noted the testimony by husband as well as his father[6] that husband's mother had put husband's name on the stocks as an estate-planning tool, and that she had never intended to make a current gift to him. However, it did not credit that testimony, citing the presumption that "the act of titling property in another's name establishes intent to convey a present [beneficial] interest in the property," *Brousseau v. Brousseau*, 2007 VT

---

[5] The inordinate delay between the initial motions and the court's actual hearing seems to be the result of multiple continuances, substitutions of counsel, discovery and other ancillary conflicts, and other motions.

[6] Due to memory loss, husband's mother was not able to testify at that point.

77, ¶ 12, 182 Vt. 533, 927 A.2d 773 (mem.), and noting that there was evidence that husband and wife had included the value of the account on asset and income statements when applying for loans. The court thus concluded that husband had an interest in the account that was subject to distribution by the trial court, and proceeded to consider the extent of husband's interest.

¶ 11. Noting that most courts presume that such joint accounts are held in equal shares, and that by statute Vermont law presumes that jointly held real property is held in equal shares, 27 V.S.A. § 2(b)(2)(A), the trial court presumed that husband and his mother held equal shares in the account. Because it found no evidence to rebut this presumption, the trial court concluded that half of the shares in the disputed account were subject to distribution. The court thus ordered husband's mother, to whom husband had purportedly transferred his interest in 2009, to convey to wife seventy percent of husband's interest in the account, or thirty-five percent of the account (exclusive of any withdrawals or liquidations made since the account's transfer, and inclusive of any dividend reinvestments or share splits).

¶ 12. With respect to spousal maintenance, the court reviewed the ebbs and flows of husband's income over several years, and compared that income to the income relied upon by the trial court in assessing spousal maintenance in the first instance. The court concluded that the initial divorce decree and spousal-maintenance award assumed that husband's annual income was $78,000, representing his salary from the family business. The court found that husband had paid his spousal maintenance through March 2009, but had not paid anything thereafter. With respect to husband's income, the trial court found that in 2009 husband's salary from the family business was reduced to $21,230, plus $28,000 of other income. The court found that this loss was genuine and not contrived by husband and his family to affect the litigation; rather, it arose from conflict in husband's relationship with his father. By 2010, although his income from the family business remained low, husband's own business had substantial income that returned him to the level assumed by the trial court in the final divorce decree. The trial court concluded that it could not reliably determine husband's 2011 income. Husband's 2011 tax returns had not been completed at the time of the hearing. The court found that the family business was not doing as well by that time, but husband's overall trucking business increased in the wake of Hurricane

Irene. Husband had to borrow money to register his trucks and buy workers' compensation insurance, which the trial court found to undercut wife's testimony that husband was making hundreds of thousands of dollars. Husband's affidavit of income and assets (Form 813), dated May 2011, reflected $4,000 per month in monthly expenses, leading the trial court to infer that he had income sufficient to support those expenses.

¶ 13. As of the 2012 hearing, the trial court concluded that husband's income had dropped relative to the time of the final divorce, although not by as much as husband suggested. At the time of the hearing, the court found that husband was working full-time trying to shore up the family business, was earning $1,000 per week, and did not have time to earn more through his other businesses.

¶ 14. On the basis of these findings, the trial court modified husband's spousal-maintenance obligation from April 1, 2009 to April 1, 2010 to $200, but then restored his prior spousal-maintenance obligation to the $1,000-per-month level of the final divorce decree for the period from April 1, 2010 to January 1, 2012. Thereafter, and prospectively, given its findings of husband's substantially reduced income, the court reduced his spousal-maintenance obligation to $850 per month. The court calculated the arrearage due to wife on the basis of these figures.

¶ 15. ▆▆▆ Wife now appeals from this order, objecting to the trial court's decision permitting intervention, the court's modification of the property-division award, and the court's downward modification of spousal maintenance.[7] Husband's mother, as intervenor,

---

[7] Husband's mother urges us to dismiss this appeal or disregard wife's arguments because wife's brief did not comply with this Court's rules, did not include a printed case, and includes a host of documents not admitted into evidence below. To the extent wife has submitted documents not in the record below, we do not consider them. See V.R.A.P. 10(a) (explaining that the record on appeal consists of original documents, data and exhibits filed with the trial court, as well as transcripts). We exercise our discretion pursuant to V.R.A.P. 30(f)(1) to dispense with the requirement of a printed case. Although wife has failed to state her arguments clearly and concisely, with citations to the record and applicable law, V.R.A.P. 28(a), we can discern from her brief several challenges relevant to the order subject to this appeal: she objects to the trial court's allowing husband's mother to intervene by post-judgment motion as well as the trial court's revision of the property division order, and she argues that the trial court's modification of spousal maintenance was not supported by the evidence. Given the leeway that we have traditionally afforded to parties who are not represented by a lawyer, we

cross-appeals the order directing her to transfer shares to wife. Husband has not entered an appearance in this appeal.

## I. The Disputed CNB Account

### A.

¶ 16. The first question is whether husband's mother was entitled to intervene in the parties' divorce case. On these narrow facts, we conclude that insofar as husband's mother was a record owner of property over which the trial court exercised its jurisdiction, the trial court did not err in allowing her to intervene.

¶ 17. ■ The Vermont Rules for Family Proceedings, which govern divorce cases such as this, provide that in general the Vermont Rules of Civil Procedure apply in divorce cases. V.R.F.P. 4(a)(1). Those rules, in turn, provide for intervention of right "[u]pon timely application . . . when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." V.R.C.P. 24(a)(2). The rules also provide for permissive intervention, in which a court may, in its discretion, allow intervention "when an applicant's claim or defense and the main action have a question of law or fact in common." *Id.* 24(b)(2). No statute or other rule poses an impediment to husband's mother's intervention, and we have previously recognized that the usual standards governing intervention pursuant to V.R.C.P. 24 apply in divorce cases. *Ihinger v. Ihinger*, 2003 VT 38, ¶ 10, 175 Vt. 520, 824 A.2d 601 (mem.).

conclude that these issues are raised with sufficient clarity in wife's brief to warrant our consideration. See *Sandgate Sch. Dist. v. Cate*, 2005 VT 88, ¶ 9, 178 Vt. 625, 883 A.2d 774 (mem.) (noting that this Court has "traditionally given wider leeway" to litigants representing themselves); *Beyel v. Degan*, 142 Vt. 617, 619, 458 A.2d 1137, 1138 (1983) (considering arguments that could be discerned from brief filed by self-represented appellant even though appellant had failed to state the case concisely, to clearly delineate the issues for resolution, and to cite supporting authority).

¶ 18. ■ Here, husband's mother has a documented record interest in property over which the court asserted jurisdiction.[8] If husband's mother were not allowed to intervene, wife could find herself holding a judgment for property distribution on which she cannot collect — likely triggering a post-judgment motion in this case to revisit the property-distribution award. Husband could be forced to choose between violating husband's mother's legal rights or facing sanctions for contempt in this case. Husband's mother would be forced to initiate a declaratory-judgment action involving all the same parties and issues. And the family division would undoubtedly be called upon to determine the ramifications of the collateral judgment for the final divorce decree in this case. Considerations of finality and judicial economy favor resolution of husband's mother's claims in the context of the ongoing post-divorce proceedings in this case, further supporting the trial court's exercise of discretion.[9]

¶ 19. ■ ■ Nor can we conclude that the trial court abused its discretion in declining to deny the intervention as untimely. See *Mohr v. Vill. of Manchester*, 161 Vt. 562, 562, 641 A.2d 89, 90 (1993) (mem.) (noting that the trial court has the discretion to deny intervention as of right when the motion is untimely). Wife suggests that we can infer from husband's mother's relationship with him, and husband's mother's involvement in the litigation, that husband's mother was on notice throughout the divorce proceedings that the CNB account bearing her name was in play. But the testimony as to when husband's mother first learned that the court had ordered that the part of the CNB joint stock account be distributed to wife was inconclusive, and the trial court made no findings that would support the supposition that husband's mother knew of the court's order and sat on her rights. We have held that "intervention may be permitted even after final

---

[8] We need not here consider whether a third party who claims ownership of property without a record such as a deed or stock certificate may likewise intervene in a pending divorce action.

[9] Husband's mother argues that a refusal to allow her to intervene and prove her claim before she is deprived of property titled in her name would raise due process issues. See, e.g., *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (stating that the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner). Because we affirm the trial court's decision to allow her to intervene on the basis of the rules, we do not reach the constitutional question.

judgment where those already parties are not prejudiced, and that where there is real potential for harm to the intervenor intervention should be denied as untimely only in extreme circumstances." *Elwell v. Vt. Commc'ns Mktg. Grp., Inc.*, 133 Vt. 627, 629, 349 A.2d 218, 220 (1975) (citation omitted). In *Elwell*, this Court held that the trial court did not abuse its discretion in allowing intervention after a final judgment in connection with a tax foreclosure where the judgment against the defendant in the case was to be levied against property that the intervenor claimed it owned. *Id.* at 627-30, 349 A.2d at 219-21. This case is very similar; husband's mother contends that the property implicated by the trial court's judgment belongs to her. We conclude that the trial court did not abuse its discretion in allowing intervention.

## B.

¶ 20. The next question is whether the trial court erred in determining that for the purpose of an order dividing the disputed account, husband's interest in the disputed joint account, subject to the court's power to distribute, was fifty percent.[10] The question of what portion of the account can properly be considered marital property is distinct from the question of what portion of the account is subject to attachment by husband's judgment creditors, but the latter analysis informs the former. If, under Vermont law, the entire account is available to satisfy husband's judgment creditors, then it would be incongruous to conclude that only half of the funds in the account, or none of the funds in the account, are part of the collective marital estate. Wife's interest in the account as part of the marital estate ought to be at least as robust as that of husband's creditors.

¶ 21. This Court apparently has not addressed the question of the extent to which a third-party creditor may secure trustee process against a bank account owned jointly between a debtor and a nondebtor. Many courts have held that a third-party creditor can garnish only the debtor's share of a joint bank account — presumed to be an equal share in the absence of contrary evidence. See, e.g., *In re Kondora*, 194 B.R. 202, 209 (Bankr. N.D. Iowa 1996) (applying Iowa law and concluding that creditors could garnish up to but no more than half of the bank

---

[10] There was ample evidence to support the court's finding that the disputed CNB account was, in fact, a joint account held by husband and his mother.

account held jointly by debtor and her ex-husband where neither the creditors nor the ex-husband successfully rebutted presumption that debtor and ex-husband each owned half of account). In *Kondora*, the bankruptcy court concluded that under Iowa law joint bank accounts are rebuttably presumed to be owned in equal shares by the tenants, and that "[d]uring a joint tenancy, each joint tenant is liable to have the tenant's fractional interest taken in satisfaction of the tenant's debts." *Id.* (citations omitted); see also *Walnut Valley State Bank v. Stovall*, 574 P.2d 1382, 1386 (Kan. 1978) (where creditor seeks to garnish account jointly held by debtor and nondebtor, the "presumption of equal ownership should prevail in the absence of proof of ownership in some other proportion"); *Danielson v. Lazoski*, 531 N.W.2d 799, 801 (Mich. Ct. App. 1995) ("[W]ith respect to garnishment proceedings . . . [joint account owners] are presumed to be equal contributors and equal owners and . . . under this presumption, the garnishment order regarding [debtor's] assets applies only to his half of the . . . funds.").

¶ 22. Other courts take the position that in general a debtor who jointly owns an account is rebuttably presumed to own the entire account such that the full amount of the account is available to judgment creditor for garnishment. See, e.g., *Fleet Bank Conn., N.A. v. Carillo*, 691 A.2d 1068, 1072 (Conn. 1997) (concluding that "a coholder's property interest in the joint account exposes that account, in its entirety, to the creditor's collection powers"); *Amarlite Architectural Prods., Inc. v. Copeland Glass Co.*, 601 So. 2d 414, 416 (Ala. 1992) ("[J]oint accounts are garnishable to the extent of the ownership of the debtor . . . [and] there is a rebuttable presumption that the funds in the joint account belong to the debtor."); *Maloy v. Stuttgart Mem'l Hosp.*, 872 S.W.2d 401, 402 (Ark. 1994) (same); see generally M. Churchill, Annotation, *Joint Bank Account as Subject to Attachment, Garnishment, or Execution by Creditor of One Joint Depositor*, 86 A.L.R.5th 527, §§ 7, 8 (2001).

¶ 23. ■ ■ Like the trial court, we conclude that the former rebuttable presumption — that only a debtor's pro rata share of a joint account is subject to garnishment by that debtor's individual creditors — applies in Vermont. In the context of real property, the Legislature has specifically provided that unless otherwise specified, joint tenants to real property are presumed to have equal interests. See 27 V.S.A. § 2(b)(2)(A). Although rules

applicable to real property do not necessarily apply to personal property such as bank accounts, the starting presumption as to parties' likely intentions reflected in the real-property statute applies with equal force to joint bank accounts. By analogy, this rule provides a reasonable basis for determining the portion of the account subject to equitable division as part of the marital estate. Accordingly, we conclude that the trial court did not err in presuming, absent persuasive evidence in either direction, that the share of the joint account shared by husband and husband's mother that was subject to the family court's property distribution was fifty percent.

## C.

¶ 24. In light of its finding as to husband's distributable share of the disputed account, the next question is whether the trial court abused its discretion in amending the final order to award wife seventy percent of husband's fifty-percent share of the disputed account, effectively reducing wife's share of the overall property distribution relative to husband's. Husband's mother did not necessarily advocate reducing wife's overall share of the property distribution; she simply sought to prevent the court from assessing a judgment against her assets. She argued that the court was free to order husband to pay wife the value of the disputed CNB account. Wife clearly contests the court's order that effectively reduced not only the real dollars she received, but also her proportionate share of the overall marital estate, since she was to receive a disproportionate share of the CNB account.

¶ 25. ■ We review the trial court's decision deferentially both because the family division "has wide discretion in the disposition of marital property upon divorce, and we will affirm its decision where we find reasonable evidence to support the court's findings and conclusions," *Johnson v. Johnson*, 155 Vt. 36, 43, 580 A.2d 503, 507 (1990), and because our review of a trial court's exercise of discretion to amend a judgment pursuant to V.R.C.P. 59 or 60(b), as applied to the family court through V.R.F.P. 4(a), is deferential. *In re D.M.*, 162 Vt. 33, 36, 641 A.2d 774, 776 (1994) (stating that we review trial court decision on V.R.C.P. 60(b) for abuse of discretion).[11]

---

[11] Husband's mother filed her motion more than ten days after the trial court's order, designating both V.R.C.P. 59 and V.R.C.P. 60 as bases for her motion. Even

¶ 26. ■ Affording this deference, we conclude that the trial court was within its discretion. The court expressly considered the rights in the shares that wife had as a creditor, and noted that if it were considering the question of property division from scratch it might divide the stock differently. Although the court may have had the discretion to increase the portion of husband's interest in the CNB account to be distributed to wife in light of the fact that husband's distributable interest in the account was half of what the trial court supposed, or to require some sort of payment from husband's separate resources to make up for wife's shortfall, it was not required to do so. In this exceptionally rancorous and lengthy divorce, the trial court opted to remove husband's mother's interest in the joint account from consideration, and maintain the same seventy-thirty proportionate division of the remainder. The final decree awarded wife the proceeds from the sale of the marital residence, direct payments from husband, and seventy percent of the LPL portfolio and the CNB stock account that was held jointly by husband and wife and is not in dispute here. The value of these awards collectively exceeds $375,000. The evidence reflects that the value of the disputed stock account was about $59,000. Because she is now to receive seventy percent of *half* of that figure, instead of seventy percent of the full amount, wife stands to receive about $20,000 less than she expected. (Because the court ruled that husband has an interest in only half of the disputed stock account, and he was allocated thirty percent of that account, husband likewise retains about $9,000 less than expected.) In the context of the overall property-division award, we conclude that the trial court did not abuse its discretion by declining to readjust the property division to mitigate the impact on wife's proportionate share of the total property distribution.

## D.

¶ 27. ■ ■ We briefly address husband's mother's claim on cross-appeal that both joint account holders have an undivided interest in the whole and therefore the joint account cannot be breached to pay husband's individual debts, including his obliga-

if V.R.C.P. 59 applied, notwithstanding this delay, the trial court's ruling would be subject to the same deference. *Houghton v. Leinwohl*, 135 Vt. 380, 382, 376 A.2d 733, 736 (1977) (stating that decision on V.R.C.P. 59 motion "is addressed to the sound discretion of the trial court" and will not be disturbed in the absence of "manifest abuse of discretion").

tions to wife. Although courts are divided on which presumption applies — a presumption that joint account holders own equal interests versus a presumption that a debtor has a garnishable interest in the entire joint account, courts in both of these camps agree that a debtor's share of a joint account — determined with reference to whichever presumption or presumptions the courts apply — is subject to garnishment by creditors. See *supra*, ¶¶ 21-22 and cases cited therein. Although property division in a divorce case is not identical to the attachment of funds by a creditor, it is closely analogous. Insofar as we have concluded that a portion of the funds are subject to attachment to satisfy husband's judgment creditors, and thus available to help meet husband's expenses and debts, they are properly considered part of the marital estate. To the extent that husband's mother argues that as a matter of law no portion of her joint account with husband is subject to distribution to wife, this argument flies in the face of a widespread consensus.

## II. Spousal Maintenance

¶ 28. Many of wife's objections to the spousal-maintenance order and the evidence upon which it was based relate to the final divorce order. This Court affirmed that order on appeal, *Barrup*, No. 2010-018, 2010 WL 7799798, and the order has long been final. We will not revisit the trial court's findings and conclusions in its final order and decree of divorce.

¶ 29. Many of wife's arguments relate to husband's failure to pay her the spousal maintenance required by the court's order, and her motion to enforce. Husband has not cross-appealed the trial court's order compelling him to pay spousal-maintenance arrearages, so we do not review the trial court's order enforcing spousal maintenance.

¶ 30. Wife also objects to the trial court's downward modification of husband's spousal-maintenance obligation. We interpret her arguments as a challenge to the sufficiency of the evidence to support the court's modification order, and to the trial court's exercise of discretion in connection with the modification motion.

¶ 31. In the event of "a real, substantial, and unanticipated change of circumstances," a court may modify a spousal-maintenance order. 15 V.S.A. § 758. In modifying spousal mainte-nance, a court may apply the factors set forth in 15 V.S.A. § 752. "[T]he standard of review regarding a trial court's finding of

changed circumstances is a deferential one. . . . [W]e will not disturb the court's determination unless its exercise of discretion was on grounds or for reasons clearly untenable, or the exercise of discretion was to a clearly unreasonable extent." *Meyer v. Meyer*, 173 Vt. 195, 197, 789 A.2d 921, 923 (2001). Moreover, "[a] court has broad discretion in determining the amount and duration of a [spousal-]maintenance award, and we will set it aside only when there is no reasonable basis to support it." *Stickney v. Stickney*, 170 Vt. 547, 548-49, 742 A.2d 1228, 1231 (1999) (mem.).

¶ 32. ▮▮ ▮▮ We conclude that the trial court's order in this case was within its discretion. The trial court found that husband had suffered a substantial drop in income in 2009, significantly undermining his ability to pay wife $12,000 in annual spousal maintenance. The trial court further found that after a temporary rebound in his income in 2012, husband experienced another sustained drop in his income attributable to challenges facing the family business and the effective end of his other businesses. He was earning around $52,000 as opposed to the $78,000 contemplated in the final divorce decree. The trial court found that this income drop was real. Even though wife offered testimony and evidence to the contrary, there was evidence to support the trial court's findings. *Smith v. Wright*, 2013 VT 68, ¶ 22, 194 Vt. 326, 79 A.3d 876 ("As a general matter, we will uphold factual findings on appeal if any credible evidence in the record supports them, leaving credibility determinations to the trier of fact.") (alteration and quotation marks omitted). And these income drops were sufficient to support the trial court's implicit finding of a real, substantial, and unanticipated change of circumstances.

¶ 33. Given the changed circumstances, the trial court's modest reduction of spousal maintenance by $150 per month, from $1,000 per month to $850 per month, in response to husband's income drop of over $2,000 per month, likewise did not exceed its discretion. Although wife believes husband is making more money than he acknowledges, the trial court credited husband's evidence — to an extent — and concluded that the modest reduction in spousal maintenance was warranted. That conclusion was within the trial court's discretion.

*Affirmed.*

¶ 34. **Skoglund, J.,** concurring. I write separately to urge caution in allowing third parties to intervene in divorce cases. This

is the first time this Court has approved an intervenor seeking to protect her property interests in a divorce proceeding. The only other time we dealt with a third party so situated, *Stearns v. Stearns*, 10 Vt. 540 (1838), we denied creditors' request to intervene without discussion. Courts in other states have limited intervention in divorce cases, and given our repeated instruction that the family division is a court of limited jurisdiction, we ought to do the same.

¶ 35. To strike a balance between "[c]onsiderations of finality and judicial economy," *ante*, ¶ 18, on one hand, and preventing banks, distant cousins, and a host of other intervening strangers from protracting often tense divorce proceedings and undermining the privacy and dignity of spouses engaged in such litigation, on the other hand, we should limit who may intervene in divorce cases and the circumstances under which they may do so. Indeed, I believe 4 V.S.A. § 33, which outlines the family division's jurisdiction, and 15 V.S.A. § 751, which governs the division of marital assets, compel these limitations. See *Luthen v. Luthen*, 596 N.W.2d 278, 281 (Minn. Ct. App. 1999) (denying intervention of husband's general creditors based in part on reasoning that Minnesota's marital property division statute, similar to 15 V.S.A. § 751, "makes no mention of third-party creditors . . . having a vested interest in the marital property of either the husband or the wife"). The following restrictions would, in my opinion, strike that balance: (1) that the third party's interest be in the form of a direct proprietary claim as to a particular asset, rather than an unvested future interest or general, unsecured debt interest against one or both spouses; (2) that the intervenor show prima facie proof of her purported interest and that such interest will be directly affected by disposition of the matter in which intervention is sought; (3) that the amount or share of the particular property be in dispute; (4) that the intervention be sought only to directly challenge distribution of property to which the third party claims an interest, not to address any other ancillary matters; and (5) that the intervenor's interest not be adequately represented by one of the party-spouses.

¶ 36. Strong public policy dictates that the rights of spouses to their own divorce proceeding, where they can present their individual respective claims to marital property, maintenance, and child support, cannot be clouded by intervenors outside the marriage who speculate that they have a financial stake in one

spouse getting more money than the other. "A third party seeking intervention in a divorce proceeding for the purpose of protecting a property interest assumes the burden of demonstrating an interest which will outweigh the substantial privacy interests of the divorcing parties." *Boyle v. Boyle*, 459 S.E.2d 401, 404 (W. Va. 1995) (interpreting a rule virtually identical to V.R.C.P. 24 and holding that courts must balance the parties' substantial privacy interests against considerations relating to potential intervenor's interests). We should be especially mindful of the limiting language of Vermont Rule of Civil Procedure 24 in divorce proceedings in light of the emotional and private nature of such cases and the circumscribed jurisdiction of that tribunal. See *Golden v. Cooper-Ellis*, 2007 VT 15, ¶¶ 35, 43-46, 181 Vt. 359, 924 A.2d 19 (holding that family court had no jurisdiction to determine husband's brother's rights, allegedly created by oral agreement between husband and brother, with respect to marital real property, and that court properly determined husband's interest based on record title); see also *Wade v. Wade*, 2005 VT 72, ¶ 12, 178 Vt. 189, 878 A.2d 303 (family court could not analyze ownership of an account titled in child's name for purposes of equitable property distribution in a divorce proceeding because divorce court had no jurisdiction over Uniform Gifts to Minors Act issues); *Ward v. Ward*, 155 Vt. 242, 247-48, 583 A.2d 577, 581 (1990) (denying joinder of tort claims between parties in a divorce action and noting that joining potentially adversarial civil claims to a divorce action undermines the " 'amicable settlement of disputes that have arisen between parties to a marriage' " (quoting *Simmons v. Simmons*, 773 P.2d 602, 604-05 (Colo. App. 1988)).

¶ 37. " 'Because equity seeks always to do complete justice, [however,] third parties are properly joined in a divorce action so as to facilitate resolution of the spouses' marital claims.' " 1. B. Turner, Equitable Distribution of Property § 3:6, at 112-13 (3d ed. 2005) (quoting *Brown v. Brown*, 525 S.E.2d 359, 360 (Ga. 2000)). In a divorce proceeding where the family division's ruling on ownership of a particular asset will directly affect a third party's vested interest in that asset, the intrusion caused by allowing intervention will be outweighed by considerations of finality and judicial economy. See, e.g., *Baker v. Baker*, 128 N.E.2d 616, 617-18 (Ill. App. Ct. 1955) (approving intervention of husband's siblings where wife's complaint sought partition of real estate jointly owned by spouses, and siblings claimed they loaned money to

purchase house in exchange for execution of mortgage). There, a second court action to resolve the third party's interest would be inevitable and imminent. Indeed, where a third party's interest is direct and substantial, that third party may be indispensable to the property-distribution proceeding. See *In re Marriage of Zabel*, 565 N.W.2d 240, 243-44 (Wis. Ct. App. 1997) (husband's mother was properly joined, even against her will, where wife alleged that husband fraudulently conveyed marital home to mother).

¶ 38. The scales would tip the other way, however, where a third party's interest is inchoate or general as to one or both spouses, rather than tied to particular property. In those situations, a second court action may not even be necessary and the family division's distribution of property would not prejudice that third party. See, e.g., *Luthen*, 596 N.W.2d at 281-84 (denying intervention of social services agency and mother of husband's out-of-wedlock child, who sought to ensure that husband was left with sufficient assets from which to pay child support, because they were essentially general unsecured creditors); *Poteat v. Poteat*, 632 S.W.2d 511, 512 (Mo. Ct. App. 1982) (reversing trial court's grant of insurance company's motion to intervene because insurance company's claim as judgment creditor of husband "d[id] not originate in anything appearing in the dissolution action pleadings, nor w[ould] it gain or lose by the direct operation of any property disposition made in the dissolution decree."). Therefore, intervention by general unsecured creditors or third parties with inchoate interests in marital property would seem to be rarely necessary.

¶ 39. A third party's direct, vested claim to a particular asset subject to distribution is not enough, though, to guarantee him intervenor status. Where the proportion of ownership of an asset as between a party-spouse and the potential intervenor is undisputed, distribution of only the spouse's share does not directly affect the third party's share. See Turner, *supra*, § 3:6, at 116 & n.16 (citing cases). Intervention there is not necessary to protect the third party's interest. See *Marks v. Marks*, 609 So. 2d 710, 710 (Fla. Dist. Ct. App. 1992) (per curiam) (holding that trial court should have divided majority shares of corporation between spouses without joining minority third-party shareholders). On the other hand, where a party-spouse and the third party do not agree as to their proportion of ownership, the family division can properly resolve the third party's claim as part of its obligation to identify the parties' property. Turner, *supra*, § 3:6, at 116.

¶ 40. Finally, intervention should be limited to the smallest intrusion necessary to resolve the property dispute. See, e.g., *Aarestrup v. Harwood-Aarestrup*, 868 A.2d 817, 820 (Conn. Super. Ct. 2005) (granting motion to intervene in divorce action for limited purpose of holding a hearing to determine ownership of the property in question). Courts should consider whether the potential intervenor could enforce any alleged rights in a separate action and the extent to which the third party's interest would be adequately represented by one of the spouses, "thereby avoiding their inappropriate insinuation into the private affairs of a married couple." *In re Marriage of Gonzalez*, 2000 UT 28, ¶ 40, 1 P.3d 1074. See also, e.g., *Fisher v. Fisher*, 546 N.W.2d 354, 358 (N.D. 1996) (denying intervention of minority shareholders of closely held corporation owned by divorcing spouses, noting minority shareholders' "many [other] routes to relief" and speculative, complicated process of valuing minority shares); *Ex parte Kirkley*, 418 So. 2d 118, 120 (Ala. 1982) (finding intervention of first wife in divorce action between husband and second wife inappropriate because first wife had no "right or title" to marital property and could seek to obtain money owed to her under prior divorce decree through separate contempt suit).

¶ 41. In consideration of the above factors, husband's mother in this case was properly joined as an intervenor, but I stress the narrow grounds upon which I agree with the result.