REPORTED

IN THE COURT OF SPECIAL APPEALS

 OF MARYLAND

No. 2744

September Term, 2014

_____

NATASHA BURAK

v.

MARK BURAK, *et al.*

_____

Nazarian,
Arthur,
Friedman,

JJ.

_____

Opinion by Nazarian, J.

_____

Filed:  December 7, 2016

After a five-day custody merits hearing, the Circuit Court for Montgomery County granted physical and legal custody of the sole minor child ("Child") of Natasha Burak ("Wife") and Mark Burak ("Husband") to Husband's parents (individually, "Grandfather" and "Grandmother," and, collectively, the "Grandparents"). After a merits hearing relating to property distribution, the circuit court determined that money the Grandparents had contributed toward the purchase of Wife and Husband's marital home was a gift conditioned on Husband and Wife's continued marriage and use of the home, for the sole benefit of the Child, and because the divorce violated that condition, the Grandparents were entitled to recover those funds. After a child support hearing, the court ordered Husband and Wife to pay child support to the Grandparents. Wife challenges all of these decisions; Husband does not, and apparently has decided to align his interests with his parents'. We dismiss one of Wife's challenges for failure to provide a transcript, reverse the judgment in favor of the Grandparents as to the marital home proceeds, and otherwise affirm.

## I. BACKGROUND

Husband and Wife were married on October 7, 2006, and Child was born on June 24, 2008. Husband testified at the custody hearing that one week before the wedding, Wife told him that she had been diagnosed with multiple personality disorder.[1] On June 20, 2011, Husband and Wife, using $131,000 from the Grandparents as a down payment, purchased a $355,000 home in Silver Spring.

---

[1] Although several witnesses testified that Wife displayed multiple personalities during the marriage, the record does not clearly establish whether she actually had such a disorder.

During the marriage, Husband and Wife were involved in a polyamorous relationship with a woman we'll call M.[2] Husband and Wife met M in late 2008 when they all lived in the same apartment building. Husband testified that about two weeks after meeting M, he and Wife talked to her about beginning a sexual relationship with her. M testified that as part of this discussion, Wife told her that she had dissociative identity disorder or multiple personality disorder. Wife, however, testified that the sexual relationship with M started "[b]y [Husband] introducing it." Husband, Wife, and M met "[a] couple . . . to a handful [of] times a month" until M moved into the family home in 2012.

From September 2012 through February 2013, Husband, Wife, and M participated in counseling because Husband wanted M to stay in the house while Wife wanted M to leave. The sexual relationship between M and Wife had ended in December 2012. Wife testified at the custody hearing that she felt coerced by Husband, but offered no other evidence that Husband was coercing or influencing her to have a relationship with M. Husband and M testified that Husband never forced Wife to have a sexual relationship with M.

During their marriage, Husband and Wife smoked marijuana and used several other drugs together and with M. They scheduled their drug use to allow Husband and Wife to

---

[2] Wife also had a long-term sexual relationship with another man during the marriage. We have hesitated somewhat to include these details, since the divorce itself is uncontested. Ultimately, though, as we explain later, the chaos and instability of Child's home environment mattered to the custody decision (although not the parents' sexual preferences or orientations), and we need to paint an accurate picture of his circumstances.

coordinate care for the Child by the Grandparents at the Grandparents' home. These sessions occurred "[a]nywhere from every other weekend to once a month, to sometimes it would be a few months." Wife testified that she only used drugs at Husband's insistence, but offered no other evidence that Husband "coerced" or "influenced" her. Wife kept a calendar that indicated when she was "tripping." Both Husband and M testified that Wife was never forced to use drugs, and Husband testified that it was Wife's idea that they use cocaine.

## A. The Grandparents

The Grandparents are both retired and live in a home with a room for Child. The Grandparents have been "heavily involved" in Child's life—Child spent many weekends and a significant amount of weekday time with the Grandparents, including when his parents were using drugs. As an infant, Child spent three days each week and occasional weekends at the Grandparents' home. When he was older, Child spent two to four days or nights per week at the Grandparents' home. Husband also testified that Wife asked that Child go to the Grandparents' when she would otherwise be left alone with him and that this "became more routine" during their marriage.

In addition, the Grandparents frequently took Child to the doctor and the dentist so that Husband and Wife would not have to take time off from work, and they arranged for Child to attend school programs and recreational activities. The Grandparents took Child to church on Sundays when he was with them. According to Wife's testimony, the Grandparents "[ha]ve tried to act as parents" to Child.

3

## B.    Husband And Wife's Separation

Husband and Wife's relationship became strained in 2012 as a result of frequent fights that included profane name-calling and screaming at each other.  Both Husband and Wife testified about incidents leading to their separation.  Wife testified that Husband became physically violent and threatened to kill her during a trip to King's Dominion with M.  Husband countered that he hit Wife because she intentionally slammed his arm with the car door and that he did not ever threaten to kill her in front of Child.

On May 30, 2013, after these incidents, Husband and Wife separated and Wife sought and received a protective order against Husband.  While the restraining order was in effect, Wife voluntarily arranged visitation with the Grandparents so that Husband could see Child on a weekly basis under the Grandparents' supervision.

After the separation, Wife stayed in the marital home with Child, and they lived with two different men shortly after the separation.  From early July 2014 until at least the time of the custody hearing (which began on September 15, 2014), Wife and Child lived with Wife's daughter, Wife's daughter's adoptive mother, father, and older sister (the "Ks"), four dogs, and twenty guinea pigs.  The Ks did not contribute toward the mortgage or household expenses during the time that they lived in the marital home.

On July 11, 2013, Wife filed a Complaint for Absolute Divorce that sought sole physical and legal custody of Child, child support, and other relief.[3]  Husband filed a counter-complaint on August 27, 2013 that requested, among other things, an absolute

_____

[3] Wife filed a First Amended Complaint for Absolute Divorce on July 9, 2014, and the circuit court entered an Order and Judgment of Absolute Divorce on January 23, 2015.

4

divorce, custody of Child, and child support. They reached a *pendente lite* settlement that provided, among other things, that Wife would have physical custody of Child, Husband would have visitation with Child under the supervision of the Grandparents and continue paying monthly child support to Wife in the amount of $500, and both Husband and Wife would be subject to random drug testing. Husband paid child support on time until August 2014.

### C. The Grandparents' Motion For Permissive Intervention

On April 24, 2014, the Grandparents filed a Motion for Permissive Intervention relating to Child's legal and residential custody and a Complaint for Custody. On May 21, 2014, Wife filed a Motion to Strike both. The trial court granted the Grandparents' Motion for Permissive Intervention on July 14, 2014.

### D. Child's Crisis Center Referral

Around May 2014, Child began exhibiting behavior issues at school. He became upset, refused to leave the classroom, and pushed desks. Child's behavioral issues continued during summer camp, around the same time that the Ks moved into the marital home with Wife and Child.

During the early part of the 2014 school year, Child became frustrated and angry and sometimes left his classroom and the school building. In one instance on September 4, 2014, Child hit and kicked the assistant principal and told the school counselor and assistant principal that he was so angry that he wanted to blow up the school. Both Grandmother and Wife arrived at the school after this incident; Grandmother had been scheduled to pick up Child for his visitation with Husband, and the school had called Wife.

5

The principal spoke to Wife about the situation in a conference room while Grandmother sat outside because Wife did not want the principal to speak with Grandmother.

The principal advised Wife that the school was referring Child to the Montgomery County Crisis Center (the "Crisis Center"), and strongly encouraged Wife to take Child there. The principal also informed Wife that the school guidance counselor had the Crisis Center referral paperwork. When the principal finished talking to Wife, Child left with Grandmother and Wife met with the guidance counselor. The guidance counselor gave Wife the form referring Child to the Crisis Center and told her to take Child as soon as she could, although Child could return to school even if the Crisis Center had not completed the referral form.

Husband's attorney—not Wife or the personnel from the school—informed Husband about the Crisis Center referral. Husband called Grandmother and learned that Grandmother had picked up Child and that Wife had not taken Child to the Crisis Center. Husband called his attorney to determine what he should do with Child, and his attorney told him to take Child to the Crisis Center. Within forty-five minutes of learning about the referral, Husband and Grandmother took Child to the Crisis Center.[4] Wife, meanwhile, attended Child's back-to-school night. After the incident, Wife never returned the form

---

[4] Wife testified that she took Child to the Crisis Center, which referred Child to a children's hospital, and that she also took Child to the children's hospital. The on-call therapist at the Crisis Center, however, testified that Child was not brought into the Crisis Center more than once on September 4 and that a referral to the closest emergency room, not a children's hospital, would follow the Crisis Center's protocol.

she received from the guidance counselor to the school, and she kept Child at home for several days after the incident.

After the incident, Child began receiving therapy through his school. Wife also testified that, although Child did not receive additional individual counseling, she did seek counseling for him.

### E. Child Custody Merits Hearing

On the first day of the custody hearing, Wife's counsel called the Court Evaluator to testify about her February 20, 2014 oral report.[5] The Court Evaluator testified about Husband's drug use and expressed concern about Husband's alleged history of sexually abusing children, including his sister and daughter from an earlier marriage. The Court Evaluator testified that she had concluded in her oral report "[t]hat it was unlikely [Husband and Wife] would be able to successfully cooperate and communicate" and recommended that Wife have primary residential and sole legal custody of Child.

During cross-examination, the Court Evaluator explained that she recommended that Wife have custody of Child because she "felt [Wife] at least expressed the desire to have primary custody and she was in therapy." The Court Evaluator testified that Wife lied to her about "the drug test results, because she told [the Court Evaluator] that she had

---

[5] On September 27, 2013, Wife had filed a Motion for Custody Evaluation Performed by the Court and the circuit court granted the motion on December 17, 2013. The Court Evaluator appeared and presented her findings and recommendation on February 20, 2014. The transcript of the Court Evaluator's oral report and recommendation, however, was not received into evidence at the custody merits hearing.

not used marijuana since . . . the parents separated.  And she did test positive for marijuana [after the *pendente lite* hearing on January 14, 2014]."

The Evaluator also testified about the Grandparents' relationship with Child, saying that they were "very important in [Child]'s life," were "intimately involved in a lot of the details of [Child]'s . . . life," and "had excellent accommodations for [Child] in their home." The Evaluator also expressed "serious concerns" about both Husband's and Wife's judgment:

> [B]oth [Husband and Wife], and the grandparents, and others, told me about ways in which both parents relied on the grandparents when they were . . . with [M], when they were having arguments, when they were using drugs together, they often told me, but [Child] wasn't adversely affected, because he was with his grandparents.  He was with them almost every other weekend, although not on a regular set schedule.  And other times the[ Grandparents] were going to the school.  They were chaperoning and volunteering at the school.  They were almost functioning as the parents.

The Evaluator expressed two further concerns: "that [she] didn't see . . . more signs of attachment and bonding between [Child] and either parent," and that either or both parents would use drugs again.  The Evaluator also felt that Child's bond with the Grandparents matched the bond he had with his parents.

At trial, Wife testified about how she cared for Child during the time between the *pendente lite* hearing and the custody merits hearing.[6]  During her cross-examination, Wife testified about a calendar containing "everything that was going on . . . at that time [2013],"

---

[6] Wife's recent therapist testified briefly and stated that Wife sometimes sought parenting advice during their sessions.

including notations regarding her drug usage and sexual relations with M, Husband, and another man, but claimed that she could not remember the meaning of her notations on the calendar. Wife also could not remember any specific threats Husband made against her.

When Husband's counsel asked Wife about emails she had written in which she referred to her alternate personalities, Wife responded that she was unsure if she wrote them "because [Husband] had access to the e-mail account," but that if she did write them, that she would have referred to herself in the third person. In response to questions from the Grandparents' attorney, Wife testified that Grandmother would not "purposely" let harm come to Child or neglect him, but that she had concerns about the Grandparents' ability to care for Child; she could not, however, "describe anything that may or may not be there" because she was "not made aware of what happens when [Child]'s [at the Grandparents'] for visitation." With regard to her drug use at the time of the custody merits hearing, Wife originally answered the judge's question by saying that she was not clean from drugs, but quickly changed her answer to say that she was.

Husband testified about his relationships with Wife and Child. He testified that he had tested negative for each of the administered drug tests and did not plan to use drugs in the future. He expressed concern about Wife's ability to care for Child and cited Child's recent behavioral issues and the Crisis Center referral. And Husband offered his belief that Wife was not fit and proper to have custody of Child, but that the Grandparents were.

M testified about her relationship with Husband and Wife. According to M, Wife was capable of becoming violent or aggressive toward Child:

9

It would be some occasional times during the, usually weekend mornings, where I would wake up and I would see [Wife] either yelling at [Child] or screaming, or whatever. And it didn't seem like it was such a big deal. It might have been over, like, a yogurt or going outside, or forgetting to, you know, throw recycling away. I mean, a mountain out of a molehill it seemed to be. And I would ask about it later, and [Wife] would tell me, well that, that was Morgan[, one of Wife's alternate personalities,] and Morgan was just starting to get really frustrated with him.

M recounted that Wife and Child "get very frustrated with each other very easily" and that Wife did not like to care for Child alone. When asked whether Wife should have custody of Child, M said no:

I don't believe that [Wife] can fully take care of herself, for starters. I have seen a marked difference in [Child]'s mood and behavior. I know that he was supposed to be in therapy, and that he's not. I know that the school's had to call in for, he's been sent to Crisis Center. I, I'm, I'm concerned about him. I don't think that the, the family, there's a family now that's living with them. And I [k]now some about that family and their lifestyle and the cleanliness and lack of cleanliness and the hoarding lifestyle that they've brought with them. I just, I, I don't think it's appropriate.

In contrast, M answered that she believed that the Grandparents were the fit and proper people to have full custody of Child because "[t]hey have the time, they have the patience, they have the home that he's been living in about half, half the time for most of his life. They know his medical history. They've been to his school functions. I mean they, they, they were in it sometimes more often than the parents were."

Grandfather testified about his relationship with Child, and explained that he and Grandmother were seeking custody because they "ha[d] very grave concerns about the ability of either [Husband] or [Wife] to bring up [Child] in a environment that will provide

10

for him the opportunities that a six year old deserves. . . . [W]e have to rescue him from a lot of the behaviors that have been described." Grandfather expressed the belief that it would be in Child's best interests to be in the Grandparents' primary care and that both Grandparents were fit and proper persons to have custody of Child. Grandfather opined as well that Child's behavior would improve if he was removed from Wife's custody.

Grandmother also expressed that she and Grandfather were fit and proper persons to have custody of Child for several reasons:

> Well, first of all, we love [Child] very, very much. And second of all, the preponderance of testimony in this courtroom today, much of which we were unaware, has made us firmly believe that neither [Wife] nor [Husband] is prepared financially, socially, morally, to raise [Child] in a[n] environment that will help to be the person that he has the potential to be. [Grandfather] and I are caretakers. [Grandfather]'s father was bedridden for 18 and a half years. The first 18 and a half years of our marriage, we drove every third weekend to New Jersey to help his mother care for his father at home. It mattered not what was going on, what invitation we had, what party was going on, we went.
> We've cared for [Grandfather]'s mother in our home, simultaneously with [Child]. She had a litany of ailments . . . . But we felt that it was an important thing for us to do. We are both caregivers.

Grandmother also expressed concern about Child's social development if Wife were granted custody, about Wife's ability to care for Child alone for long periods of time, and about Wife's handling of the Crisis Center referral.

Other non-family witnesses also offered observations. The Grandparents' next-door neighbor testified that the Grandparents' relationship with Child was more like a parent's relationship than a grandparent's, and she too opined that the Grandparents would be fit

11

and proper persons to have custody of Child. Same for a member of Grandparents' church. Child's school principal and guidance counselor testified about Child's behavior at school, including the September 4, 2014 Crisis Center referral incident. Husband also called a clinical psychologist who had counseled Husband, Wife, and M and she testified about the emotional amplitude of the unconventional relationship, which included yelling, arguing loudly, and "going at it in a volatile manner."

At the conclusion of the five-day custody trial, on September 19, 2014, the court, in an oral ruling, granted physical and legal custody of Child to the Grandparents.

**F.     Interim Orders**

The court followed its oral custody ruling with an interim order dated September 24, 2014 restating its finding that "neither [Wife] nor [Husband is] fit and proper to have custody of the minor child" and the presence of "extraordinary circumstances . . . that are significantly detrimental to the minor child if the child were to remain in the custody of [Wife]." In addition, the court found "that it [wa]s in the best interest of [Child] to award sole custody to the [Grandparents]" and "that the [Grandparents] are fit and proper persons to have custody of [Child]."

On October 7, 2014, the Grandparents filed an Emergency Motion to Modify and Limit [Wife]'s Access to Minor Child. After a hearing on the motion, the court, in a second interim order, granted the Motion and prohibited overnight visits with Wife.

In a perhaps optimistically titled Final Order dated November 25, 2014, the court, among other things, ordered Wife to pay Husband "$9,628.38 as compensation for his half of the expenses he paid towards the maintenance of the family home from November 2013

12

through October 2014." On December 24, 2014, Wife filed a Motion for Partial Reconsideration of the Final Order and Motion for Expenses She Paid on [Husband]'s Behalf Towards the Maintenance of the Family Home, and the court denied that motion on June 15, 2015.

### G. The Grandparents' Motion For Child Support

In the meantime, the Grandparents filed a Motion for Child Support. A magistrate held a hearing on March 11, 2015 and, on March 24, 2015, recommended that the circuit court grant the motion. On April 2, 2015, Wife filed exceptions to the recommendation, arguing, among other things, that the child support award was grossly excessive because it required Wife to pay nearly half of her gross salary and because the Grandparents are "extraordinarily wealthy." The circuit court granted Grandparents' Motion for Child Support in an order dated May 19, 2015 and denied Wife's exceptions in an order dated May 21, 2015.

### H. Property Distribution Hearing

Over Wife's objection, the court permitted the Grandparents to intervene in the property distribution hearing. At the end of the hearing, the court granted Husband and Wife an absolute divorce and incorporated (but didn't merge) their voluntary separation and property settlement agreement, and entered an order to that effect on January 23, 2015. The court also found that the Grandparents were entitled to the first $131,000 of the proceeds from the sale of the marital home because they made a conditional loan of that amount to Husband and Wife for the purpose of allowing Child to grow up in a safe and clean home environment. The court entered an order to this effect on January 27, 2015.

13

Wife filed a Motion for Partial Reconsideration on December 24, 2014, which the Grandparents opposed on January 7, 2015. The court took Wife's Motion for Partial Reconsideration under advisement on January 20, 2015, and later denied it.

Wife filed a timely appeal. We will discuss additional facts below as necessary.

## II. DISCUSSION

Wife presents eight questions on appeal[7] that we have consolidated into five. *First*, Wife asserts that the court violated her "fundamental parental rights" under the United

---

[7] Wife stated the Questions Presented in her brief as follows:

> 1. Whether, despite the words used by the trial judge, did he actually apply the correct standard in awarding physical and legal custody of the minor child to appellee third party grandparents or did he violate Appellant's constitutional parental rights?
>
> 2. Whether the trial judge violated Appellant's and the minor child's due process rights in proceeding to trial on the Appellee Third Party's complaint one month after it was entered, without notice of any applicable allegations, without discovery and before any psychological or other expert assessment of the minor child could be performed?
>
> 3. Whether "exceptional circumstances" or parental unfitness could be found in circumstances such as this, including where Child Welfare Services, a court ordered custody evaluator and a court ordered psychologist found the appellant was fit and had no disorders, and the custody evaluator had recommended that the appellant be awarded custody?
>
> 4. Whether the trial judge otherwise abused his discretion in his application of the evidence or whether he exhibited bias in a comparison of the Appellee Grandparents to the Appellant mother?

14

States and Maryland Constitutions when it granted custody of Child to the Grandparents and abused its discretion by denying her request for a continuance. *Second*, Wife asserts that the court abused its discretion by soliciting expert testimony during a hearing in an "unorthodox manner" and, *third*, by permitting the Grandparents to intervene in the divorce property distribution hearing. *Fourth*, Wife argues that the court erred in awarding

---

5. Whether the Appellant's constitutional due process and parental rights were violated, and whether he abused his discretion, when the trial judge severely limited the Appellant's visitation with the minor child after taking "testimony" in an unorthodox manner of personally questioning the expert, who was not a sworn witness and stood in the back of the room, while not permitting cross examination or further review?

6. Whether the trial judge had jurisdiction or abused his discretion in permitting the Appellee Third Party grandparents to intervene in the divorce property distribution hearing for "judicial convenience" when the Appellant has a right to a jury trial on this claim, it is not permitted in the family law statute or procedure, and without the Appellee Third Party filing a motion, providing notice, providing discovery, or filing a cause of action, and whether the trial judge's conclusions were based on the actual evidence?

7. Whether the trial judge's order addressing the $9,628.38 in "contributions" made towards maintenance of the family home properly considered and applied the claims made by both parties?

8. Whether the order of child support, payable to the Appellee Grandparents, was in accordance with the appropriate child support provisions that did not take into account the wealth of the custodial grandparents?

Husband "'contributions made towards maintenance of the family home." *And finally*, Wife challenges the order requiring her to pay child support to the Grandparents.

We review child custody determinations using three interrelated standards of review:

> When the appellate court scrutinizes factual findings, the clearly erroneous standard of [Rule 8–131(c)] applies. [Second], if it appears that the [court] erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the [court] founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the [court's] decision should be disturbed only if there has been a clear abuse of discretion.

*In re Yve S.*, 373 Md. 551, 586 (2003). We give "due regard . . . to the opportunity of the lower court to judge the credibility of the witnesses." *Id.* at 584. And we recognize that the trial court is vested broad discretion in making custody determinations:

> [I]t is within the sound discretion of the [trial court] to award custody according to the exigencies of each case, and . . . a reviewing court may interfere with such a determination only on a clear showing of abuse of that discretion. Such broad discretion is vested in the [trial court judge] because only he sees the witnesses and the parties, hears the testimony, and has the opportunity to speak with the child; he is in a far better position than is an appellate court, which has only a cold record before it, to weigh the evidence and determine what disposition will best promote the welfare of the minor."

*Id.* at 585–86.

"If there is any competent evidence to support the factual findings below, those findings cannot be held to be clearly erroneous." *Fuge v. Fuge*, 146 Md. App. 142, 180 (2002). An abuse of discretion occurs "where no reasonable person would take the view

16

adopted by the [trial] court, or when the court acts without reference to any guiding rules or principles." *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 312 (1997) (citations and internal quotation marks omitted). "An abuse of discretion may also be found where the ruling under consideration is clearly against the logic and effect of facts and inferences before the court, or when the ruling is violative of fact and logic." *Id.* (citations and internal quotation marks omitted). However, "where the [custody] order involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the [circuit] court's conclusions are 'legally correct' under a *de novo* standard of review." *Walter v. Gunter*, 367 Md. 386, 391–92 (2002).

A. **The Circuit Court Neither Violated Wife's Constitutional Rights Nor Abused Its Discretion By Awarding The Grandparents Sole Legal and Physical Custody.**

The overriding goal in determining child custody is to serve the best interests of the child. *Conover v. Conover*, 450 Md. 51, 60 (2016) (citing *Taylor v. Taylor*, 306 Md. 290, 303 (1986) ("We emphasize that in any child custody case, the paramount concern is the best interest of the child . . . . The best interest of the child is [] not considered as one of many factors, but as the objective to which virtually all other factors speak."); *Ross v. Hoffman*, 280 Md. 172, 174–75 (1977) (asserting that the "best interest standard is firmly entrenched in Maryland and is deemed to be of transcendent importance")). At the same time, "[i]t is also well-established that the rights of parents to direct and govern the care, custody, and control of their children is a fundamental right protected by the Fourteenth Amendment of the United States Constitution." *Id.* (citing *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)); *In re Samone H.*, 385 Md. 282, 300 (2005) (stating that "[a] parent's

interest in raising a child is, no doubt, a fundamental right, recognized by the United States Supreme Court and this Court").

Normally, courts have only those competing interests to balance. Here, though, there is a third—the interests of the intervening Grandparents. As third parties seeking custody, the Grandparents first must overcome the legal preference favoring Child's parents. *In re Rashawn H.*, 402 Md. 477, 495 (2007); *Koshko v. Haining*, 398 Md. 404, 423 (2007) ("As a natural incident of possessing this fundamental liberty interest, the [parents] are also entitled to the long-settled presumption that a parent's decision regarding the custody or visitation of his or her child with third-parties is in the child's best interest." (citations omitted)); *Monroe v. Monroe*, 329 Md. 758, 781 n.4 (1993) ("Where parents claim the custody of a child, there is a *prima facie* presumption that the child's welfare will be best subserved in the care and custody of its parents rather than in the custody of others, and the burden is then cast upon the parties opposing them to show the contrary." (quoting *Ross v. Pick*, 199 Md. 341, 351 (1952))).

That presumption may be rebutted by a finding that the parents are unfit or that exceptional circumstances exist. "In a custody case, unfitness means an unfitness to have custody of the child . . . exceptional circumstances are those that would make parental custody detrimental to the best interest of the child." *In re Rashawn H.*, 402 Md. at 498 (emphases omitted). A finding of exceptional circumstances requires the court to analyze a broad range of individualized factors:

> [1] the length of time the child has been away from the biological parent, [2] the age of the child when care was assumed by the third party, [3] the possible emotional effect on

18

the child of a change of custody, [4] the period of time which elapsed before the parent sought to reclaim the child, [5] the nature and strength of the ties between the child and the third party custodian, [6] the intensity and genuineness of the parent's desire to have the child, [7] the stability and certainty as to the child's future in the custody of the parent.

*Hoffman*, 280 Md. at 191.  A third party must overcome a high evidentiary burden in establishing exceptional circumstances.  *See McDermott v. Dougherty*, 385 Md. 320, 424 (2005) ("Indeed, it is a weighty task (or should be) for a third party seeking custody to demonstrate 'exceptional circumstances' which overcome the presumption that a parent acts in the best interest of his or her children and which overcome the constitutional right of a parent to raise his or her own children.").  That a child might be better raised by a third party is not enough.  *Id.* at 326.

## 1. The circuit court did not abuse its discretion when it granted the Grandparents' Motion for Permissive Intervention.

At the threshold, we agree that the circuit court properly allowed the Grandparents to intervene in the custody case.  Wife argues that "the legislature prohibits [motions to intervene in third-party custody cases], and stated that grandparents may solely assert visitation rights under certain prescribed circumstances" because, under the doctrine of *inclusio unius est exclusio alterius*, "[t]he legislature has clearly limited [] grandparents' rights to visitation, if permitted by the [grandparents visitation] statue and caselaw."  We disagree.  Although third parties such as the Grandparents appropriately bear a difficult burden when seeking custody, there is no doubt that they are allowed to seek it.  *See, e.g., id.* at 435 (reversing circuit court judgment granting custody to the maternal grandparents

after finding that neither parental unfitness nor extraordinary circumstances existed); *Shurupoff v. Vockroth*, 372 Md. 639, 641, 660–61 (2003) (affirming circuit court's award of child custody to child's maternal grandparents).

"[I]n some states the third party seeks custody through intervention in a domestic action between the natural parents (as in the present case)." *McDermott*, 382 Md. at 355–56.[8] Maryland Rule 2-214(b)(1), the permissive intervention rule, provides that "[u]pon timely motion a person may be permitted to intervene in an action when the person's claim or defense has a question of law or fact in common with the action." Timeliness depends on the individual circumstances in each case, and consideration of those circumstances rests initially within the sound discretion of the trial court, which, unless abused, will not be disturbed on appellate review. *Md.-Nat'l Capital Park & Planning Comm'n v. Town of Washington Grove*, 408 Md. 37, 70 (2009) (citation omitted). And "in determining whether a motion to intervene has been timely filed, a court must consider the purpose for which intervention is sought, the probability of prejudice to the parties already in the case, the extent to which the proceedings have progressed when the movant applies to intervene, and the reason or reasons for the delay in seeking intervention." *Id.* at 70 (quoting *Pharmaceia Eni Diagnostics, Inc. v. Wash. Suburban Sanitary Comm'n*, 85 Md. App. 555, 568 (1991)); *see also* Md. Rule 2-214(b)(3) ("In exercising its discretion the court shall

---

[8] Other states proceed differently. In *McDermott*, 385 Md. at 369–70, the Court of Appeals discussed *Chavez v. Chavez*, 148 S.W.3d 449, 458–59 (Tex. App. 2004), a case "where a third-party grandparent intervened in a divorce case seeking to have conservatorship created in respect to the children of the marriage."

consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.").

We see no abuse of discretion in the trial court's decision to allow the Grandparents to intervene here. They filed their motion five months before the custody merits hearing and the court granted it two months before the hearing. The Grandparents raised substantive challenges to Wife's and Husband's parental fitness, and Wife thoroughly addressed the Grandparents' involvement in Child's life in her Motion to Strike Grandparents' Motion for Permissive Intervention and her Answer and Counter-Complaint, all of which demonstrates that she fully understood and had notice of the Grandparents' claims.

Furthermore, Wife did not seek discovery from the Grandparents after they filed their Motion for Permissive Intervention. Wife had an opportunity to depose the Grandparents, but waited until late August 2014 to request to do so. The Grandparents made themselves available for deposition, but Wife's attorney attempted to schedule the deposition on dates when he knew that the Grandparents' attorney was not available, which led to Wife's Emergency Motion to Postpone/Continue Custody Trial Scheduled For September 15.[9] And despite the lack of a deposition or any additional discovery, Wife

---

[9] We also see no abuse of discretion in the court's decision to deny Wife's Emergency Motion to Postpone/Continue Custody Trial Scheduled For September 15. Wife contends that the court should have continued the custody merits hearing to allow an expert to testify as to Child's present condition. Wife asserts that a continuance would have allowed her to receive prior notice on the "exceptional circumstances" factors in *Hoffman* and given her time to provide "data, assessment, and expertise" regarding Child's recent behavioral problems. Maryland Rule 2-508(a) provides that "[o]n motion of any party or on its own initiative, the court may continue a trial or other proceeding as justice may require." "The

21

stated in her brief that "[t]he [Grandparents'] strategy continued as expected at trial," which suggests that any prejudice from the Grandparents' intervention without discovery was minimal. *Cf. Green v. Green*, 188 Md. App. 661, 677 (2009) (finding no prejudice where mother was aware of the third parties' position and sought and received discovery from them).

The constitutional presumption favoring Wife over the Grandparents also cuts against the notion that Wife was prejudiced by the court's decision to permit the Grandparents' intervention. Wife's burden in seeking custody did not change—the Grandparents, as intervening third parties, undertook the burden of proving that Wife was unfit or that exceptional circumstances existed. The Grandparents also contended, and the circuit court agreed, that they decided to seek custody based on information that they learned about Husband and Wife's behavior during earlier hearings in the case when Husband and Wife began sharing explicit details of their parenting behavior. The record supports the court's conclusion that the Grandparents filed their motion for permissive intervention within a reasonable time of learning the relevant facts, and we see no abuse of discretion in its decision to allow the Grandparents to intervene.

---

ruling on a motion for continuance rests in the sound discretion of the court and will not be disturbed on appeal unless there is an abuse of that discretion." *Market Tavern, Inc. v. Bowen*, 92 Md. App. 622, 644 (1992) (citations omitted). But nothing in the record suggests that the court sought or needed an expert evaluation, or that denying a continuance prejudiced Wife's ability to make her case for custody.

**2. The circuit court did not abuse its discretion when it found that the parents were unfit, that exceptional circumstances existed, and that Child's best interests would be served if the Grandparents had custody.**

At the conclusion of the custody merits hearing, the court made several findings, then concluded from those findings that both Wife and Husband were unfit parents and that exceptional circumstances justified consideration of third-party custody. The court identified and relied on the *McDermott* standard, which states the presumption that parents should have child custody unless they are unfit *or* exceptional circumstances exist which make such custody significantly detrimental to the child. Wife disagrees, but we find that the record supports the court's conclusions.

The court began by finding that Wife and Husband were "extremely selfish" and neglected the Child. The court found that Wife lied throughout the case about her drug use and testing, her relationship with M, her mental health, and Child's school attendance following the Crisis Center referral, and that she failed to take responsibility for her actions. The court found "that [Wife] still takes [drugs] or she's still ready to take them." And the court cited Wife's unconcerned attitude about Child's volatile and violent behavior, noting that she left Child with Grandmother after the September 4 incident at his school rather than engaging directly, and that she had failed to make any adjustments to meet Child's needs. In particular, the court noted that it "didn't see any real[] love or total attachment" between Wife and Child.

Wife acknowledges that the court cited the correct standards, but contends that it applied them incorrectly. She argues that the court "compar[ed Wife] to the wealthy

23

[Grandparents]" and based its order and judgment entirely "upon impermissible conclusions, assumptions and prejudices . . . , which were themselves primarily based upon lifestyle choices the parties had made years before during the marriage." She points to the determinations by the Montgomery County Child Welfare Services that she was "a fit and proper parent of the minor child" and by the court-ordered Custody Evaluator that Wife "should have custody of the minor child," and argues that the court erred in disregarding those opinions.

As a factual matter, Wife overstates the helpfulness of those documents to her case. The Child Welfare Services report stated only that "[a]t this time [December 16, 2013], there are no child welfare issues" and "a best interest attorney or a court evaluator should be considered to evaluate both patents' interactions with the child to determine custody." That investigation was conducted nine months before the custody merits hearing and was not offered into evidence by anyone at the hearing. So even if the court had known about the results of the investigation, it was completely within its discretion to weigh the report in light of the more current evidence presented at the hearing regarding Wife and Child's living situation, which had changed from the time that the Custody Evaluator conducted her investigation and made her custody recommendation.

Wife also cites the oral finding of the "court-ordered psych evaluator" that Wife "did not have any psychological disorder." But it doesn't matter whether Wife has a psychological diagnosis—what matters is how Wife functioned (and functions). And whether or not Wife actually suffered from a psychological illness, the court was

24

appropriately troubled by the way that Wife held herself out to others, including Husband and M, as having a psychological illness when it was far from clear that she really did.

Wife argues further that the Grandparents' "belated 'knowledge' that during the mother and father's marriage they used drugs, . . . their recent litigation knowledge that one of the many drug tests taken by [Wife] came up positive for marijuana, . . . and the fact that the court had ordered a psychological examination of both of the parents" was not enough "separately or in total" to meet the exceptional circumstances standard. Wife seeks to distinguish this case from *Hoffman*, which, according to Wife, affirmed a finding of exceptional circumstances where "there was extensive psychological testimony of the potential effect of custody on the minor child" and "the focus of the third party custody [was to] retain custody by the third party, and *not* to *change* custody to the absent parent who the child had never known for the child's first eight years." (Emphases in original.)

The Grandparents respond that the court's findings about Wife's unfitness and the existence of extraordinary circumstances were supported by the evidence, and that the court did not abuse its discretion in making them. The Grandparents point out that Wife didn't support her claims of fitness with any witness testimony beyond her own, that neither Wife nor any other witness at the custody merits hearing testified that she was a fit and proper parent, and that none of the opinions referred to by Wife in her arguments were actually part of the custody merits hearing record. And the Grandparents are right on this last point: none of these opinions Wife asks us to consider were before the circuit court, and we cannot consider them now.

On the actual record that *was* developed, the court acted well within its discretion when it found the parents unfit. The record supports the court's finding that Wife still takes or is ready to take drugs and that she has struggled with parenting and properly caring for Child. The court heard and considered testimony regarding Wife's inability and uneasiness in caring for Child, and that her difficulties often resulted in her and Husband placing Child in the Grandparents' care. And the record revealed real questions about Wife's compliance with the parties' agreed drug testing regiment. She failed to comply with the Child's Best Interest Attorney's ("BIA") request for a random drug test on July 14, 2014. And although she eventually sent the results of a test the BIA requested about a month before the custody merits hearing, she refused to sign the release that would allow her results to be sent directly to the BIA. This meant that Wife received and could review her results before the BIA got them, which undermined the credibility of any negative results. Wife obviously disputes these findings and the factual premises underlying them, but the record contained ample evidence that could support the court's finding that she and Husband (who doesn't contest the finding) were unfit parents.

The record also supports the court's finding of exceptional circumstances. The evidence and testimony demonstrated that Child had been exposed for years to a volatile and unhealthy home environment; the court cited "the drugs, the sex, the craziness in the house, the different relationships, the lack of interest in the mother, the mother lying -- all of those things are factors for both [fitness and extraordinary circumstances]." The Child spent long periods of time away from Husband and Wife, especially when Husband and Wife used drugs. The court found that the Grandparents had provided a great deal of care

26

for the Child, and that "the age of the child when the care was assumed by the third party . . . was from the time of birth." The court considered the possible emotional effect on the child in a change of custody, the period of time that elapsed before the parents sought to reclaim him, the nature and strength of the ties between Child and the Grandparents, and found all factors to strongly favor custody by the Grandparents. The court did not find Wife's stated desire for custody to be genuine, and that Child "would continue with instability and he would certainly fail" in the custody of his parents.

The court then found that the Grandparents were very fit and proper for custody purposes and knew Child better than either Husband or Wife. It noted that the Grandparents provided stability for him and were "sincere, genuine, rock-solid people, the kind of people that you want raising children." As additional support, the court noted that "the parents have relied on the[ Grandparents] to do a lot of parenting things throughout this little boy's life." The court cited the financial contributions of the Grandparents, their ability to give Child the guidance and time that he needs (and that Wife had not), and the Grandparents' willingness to address Child's severe behavioral problems. The trial judge considered the Grandparents' lack of drug use, their morals and values, and their desire to have custody, as well as Child's opportunities for the future, the age and health of Child, and the stability of the Grandparents' residence. The only factor the trial judge considered which weighed against the Grandparents' custody was their age.

The concept of exceptional circumstances defies easy or mechanical definition, and we agree that it should be a rare and, well, exceptional case that can support such a finding. And there was not an absolute correlation between Child's behavioral problems and sole

27

custody with his mother; although Child began exhibiting behavioral issues in the months preceding the custody merits hearing, they didn't begin until several months after Wife's sole custody began. During the ten months in which Wife had sole custody, Child continued to have regular visitation with Husband and the Grandparents. And we recognize that "Maryland courts have been far less willing to find exceptional circumstances in situations when a child had lived in the same household as a natural parent and a third-party" than when the child had been in the sole physical custody of a third party. *Gestl v. Frederick*, 133 Md. App. 216, 238 (2000).

Even so, we find no abuse of discretion in the court's finding that exceptional circumstances exist here. Life with his parents, and even with his mother after their split, was chaotic and unstable, and the record revealed serious questions about the prospect of improvement in the short- or medium-term. The court could readily have found from this record that Child's behavior problems would continue if he were to live with Wife at this juncture, and that the Grandparents provided a stable home that Wife currently cannot. We recognize that reasonable fact-finders might disagree about whether exceptional circumstances exist here. But given the totality of the circumstances before the court in this unusual case, we cannot say that the court abused its discretion by finding exceptional circumstances that could justify consideration of third-party custody. *Cf., e.g.*, *McDermott*, 385 Md. at 425 n.44 ("upholding chancellor's finding of 'exceptional circumstances' in awarding custody of child, born to a sixteen-year-old mother, to paternal grandparents who had raised the child for four years, and observing that granting the mother substantial visitation was in recognition of her improved condition and potential to receive full custody

28

in the future" (citing *Burrows v. Sanders*, 99 Md. App. 69, 77–78 (1994))); *Hoffman*, 280 Md. at 181–82 (upholding chancellor's finding of "exceptional circumstances" in awarding custody to grandparents where the child lived with grandparents full time for over eight years, the mother saw the child irregularly and sporadically (one week and a couple days out of eight years), and made no effort to reclaim custody of the child); *Pick*, 199 Md. at 351–52 (awarding custody of child to third party over natural mother when third party had raised child for ten years after mother abandoned child); *Dietrich v. Anderson*, 185 Md. 103, 119–20 (1945) (denying father's petition for custody when child had been living with foster parents for five years).

### 3. The circuit court made an appropriate custody decision.

Wife contends *finally* that the circuit court was prejudiced and focused improperly on acts of the parties that occurred before the parties separated and Wife obtained sole custody of Child and "removed herself from her husband's influence." We disagree. The court based its custody decision on testimony and evidence developed during the merits hearing on custody, a large portion of which revolved around Child's behavior at school from two weeks earlier. Wife characterizes the court as biased, and alleges that this bias "affected his assessment regarding the credibility of [Wife] and all of her testimony" and that "other evidence is in the record and other parties testified that [Wife] had taken appropriate and responsible parental actions." This makes us wonder if Wife and her counsel are reading the same hearing transcript as we are: Wife's testimony about her own fitness stands in stark contrast to the overwhelming bulk of the testimony of other witnesses, including the school principal and guidance counselor. *See, e.g.*, E2182.12–14

29

(Wife testified that the school principal "specifically asked that [she] attend the back to school night.) *and* E2285.5–9 (Principal testified that she did not specifically ask Wife to come to back to school night.); E2184.16 (Wife testified that Child went to school on September 8, 2014.) *and* E2337.12–18 (Guidance counselor testified that Child did not attend school on either September 5 or 8, 2014.))  A trial court does not demonstrate bias simply by resolving disputed factual questions in favor of one party and against another, and we see no evidence of bias in the court's resolution of these disputes against Wife.

### B. Wife Failed To Provide A Transcript Of The Hearing In Which, She Claims, The Court Mishandled Expert Testimony.

Wife contends that at a follow-up hearing relating to custody that took place after the merits hearing, the circuit court "t[ook] 'testimony' in an unorthodox manner of personally questioning the expert, who was not a sworn witness and stood in the back of the room," "without any prior notice or examination by [Wife] or her counsel, and without any cross examination."  Despite repeated effort on the part of this Court and its staff, however, Wife never provided a transcript or record of what transpired at the proceeding for us to review.  As the appellant, Wife bore the burden "to put before this Court every part of the proceedings below which were material to a decision in h[er] favor," *Lynch v. R. E. Tull & Sons, Inc.*, 251 Md. 260, 262 (1968); *see also Nationwide Motor Sales Corp. v. Trusty*, 24 Md. App. 407, 409 (1975), and she failed to do so with regard to this issue.[10]  Accordingly, we dismiss the appeal in this one regard.

---

[10] This was true with regard to several of the hearings in this case, although ultimately (again, after effort on the part of our Clerk and his staff that should not have been necessary in the first place; we could simply have dismissed the appeal instead) Wife obtained and

30

**C. The Circuit Court Abused Its Discretion When It Granted The Grandparents' Motion To Intervene In The Divorce Property Distribution Hearing.**

Wife contends *next* that the circuit court should not have permitted the Grandparents "to intervene in the divorce property distribution hearing for 'judicial convenience,' [because of] the fact that [Wife] had a right to a jury trial on any such claim by the [Grandparents], it is not permitted in the family law statute or procedure, and was again done in an unorthodox manner without the [Grandparents] filing a motion, providing notice, providing discovery, or filing a cause of action." The Grandparents respond that allowing Wife to keep the money they provided for the purchase of the marital home would result in a "windfall" because the circuit court judge found that the Grandparents' testimony that the purchase money was a conditional gift was credible, that the money was only for the benefit of Child, and that the condition attached to the Grandparents' payment—that Wife and Husband remain married and caring for Child—had been violated. Whether or not that is true in some broader sense, we agree with Wife that this is not the appropriate proceeding for the Grandparents to assert and pursue their claim.

While Child was a baby, Husband and Wife lived in a rodent-infested apartment with no suitable play area. On June 20, 2011, Husband and Wife purchased a home, held as tenants by the entirety, for $355,000, and $131,000 of the purchase price for the home came from the Grandparents. Grandmother testified that she and Grandfather spoke with Husband and Wife about the conditions they put on this contribution:

---

submitted enough of the transcripts relating to the other issues that we could address their merits.

31

> Those conditions were that [the money] would be a zero percent interest loan, that we did expect it to be returned to us in the event of the sale of the home or they could roll it over if they bought, you know, another home, you know. And that was, that was basically the conditions.

According to Grandmother, everyone agreed to these conditions. Husband generally agreed: he testified that the Grandparents provided the money with the oral stipulation that Husband and Wife live in the house for ten years and if they moved out or split up, Husband and Wife were required to repay the money that the Grandparents provided to them. Wife, on the other hand, testified that she believed that the money was a gift. And indeed, in the course of obtaining the mortgage on the house, Husband, Wife, Grandmother, and Grandfather executed a "Gift Letter" stating that the Grandparents did not expect to be repaid:

> I, Gary & Martha Burak, do hereby certify the following:
>
> (1) I have made a gift of $130,000 to Mark & Natasha Burak Whose relationship is: Son & Daughter-in-Law
>
> (2) This gift is to be applied toward the purchase of the property located at: 2825 Vixen Lane Silver Spring, MD 20906
>
> (3) No repayment of the gift is expected or implied in the form of cash or by future services of the recipient.

The Grandparents undoubtedly could see where things were headed once the divorce got underway, and they filed a motion to intervene in the property distribution hearing. Wife's counsel objected. The circuit court heard arguments and determined that it was appropriate to adjudicate the Grandparents' claim as part of this case because their "rights were interwoven throughout this entire domestic case" and because judicial

32

economy required that the Grandparents' claim to any amount derived from the sale of the marital home be heard during the proceeding. The court also reasoned that there would be no prejudice to either party from deciding the question without discovery or a jury:

> This issue has been out front and center for months in this case. It's an issue that everyone is intimately aware of and I don't believe discovery is going to shed any additional light on this matter.

This case does not present the common situation in which a court must value encumbered marital property (and thus the encumbrances) for purposes of determining whether to make a marital award. Instead, the Grandparents sought to intervene here for the purpose of asserting a claim, as creditors, to the proceeds of marital property. The Family Law Article of the Maryland Code does not expressly address the ability of third parties to intervene in a divorce action. The Court of Appeals has held that Maryland Code (1984, 2006 Repl. Vol.), § 7-107(f) of the Family Law Article ("FL") authorizes attorneys to intervene in a divorce action involving a former client to recover fees. *Tydings & Rosenberg, LLP v. Zorzit*, 422 Md. 582, 595–96 (2011). But the Grandparents haven't cited, and we haven't found, any legal authority to support the circuit court's decision allowing them to intervene in the property distribution phase of the proceeding, nor have we found any other Maryland cases discussing a third party's ability to intervene in a divorce in order to assert a money claim against either or both of the divorcing parties.

Several other states' courts have wrestled with this same question, and reached mixed results. *Compare, e.g.*, *Moore v. Moore*, 275 S.E.2d 334, 335–36 (Ga. 1981) (affirming the trial court's grant of husband's mother's motion to intervene in the parties'

divorce action where "[t]he mother was not trying to intervene in the issue of a divorce per se . . . ; rather, she was attempting to protect her interest in the property dispute following the divorce" and where mother alleged in her motion that she had an interest in the subject property of the action and that her ability to assert such interest would be impaired by the disposition of the property between the existing parties, husband admitted that his mother had given him money to buy the house and had not intended it as a gift, and husband's denial that he was obliged to put the deed in his mother's name eliminated him as an adequate representative of his mother's interest), *and Barrup v. Barrup*, 111 A.3d 414, 420 (Vt. 2014) (holding that the trial court did not err in allowing husband's mother to intervene in his divorce case "[o]n these narrow facts" where she was a record owner of property over which the trial court exercised jurisdiction), *with Aniballi v. Aniballi*, 842 P.2d 342, 343–44 (Mont. 1992) (holding that the court did not err in denying husband's parents' motion to intervene where they allegedly loaned money for improvements to son's marital home and sought to assert interest in son and daughter-in-law's marital home because the decree of dissolution would not determine the title of marital property *in rem* and parents failed to make a prima facie showing supporting their claim on the property), *and Barrup*, 111 A.3d at 426 (Skoglund, J. concurring) ("The scales would tip [against intervention], however, where a third party's interest is inchoate or general as to one or both spouses, rather than tied to particular property."). Those states that do allow creditors to intervene tend to be community property states, where the governing law permits this. In *Olsen v. Olsen*, 247 P.3d 77, 81 (Wyo. 2011), for example, the Supreme Court of Wyoming reversed a trial court decision that the wife's mother "was entitled to a judgment against each party

34

for any deficiency remaining after the proceeds of the sale are applied to the debt" owed to

her by the parties. In support of its holding, the Court in *Olsen* referred to its earlier

decision in *Nielson v. Thompson*, 982 P.2d 709 (Wyo. 1999), which distinguished

community property states from non-community property states in this regard:

> While this Court has said that third parties claiming rights in property that is subject to a property settlement may intervene or be joined, we were not addressing the rights of a judgment creditor. *Merritt v. Merritt*, 586 P.2d 550, 554 (Wyo. 1978). Some states, notably those with community property laws, permit creditors to intervene in divorce actions as a matter of course. *Elms v. Elms*, 4 Cal. 2d 681, 52 P.2d 223, 224 (1935); *Malcolm v. Malcolm*, 75 N.M. 566, 408 P.2d 143, 144 (1965); *Fletcher v. National Bank of Commerce*, 825 S.W.2d 176, 179 (Tex. App. 1992); *Boyle v. Boyle*, 194 W. Va. 124, 459 S.E.2d 401, 404 (1995). On the other hand, several states bar creditors from intervening in divorce cases. *Eberly v. Eberly*, 489 A.2d 433, 446 (Del. Supr. 1985); *Poteat v. Poteat*, 632 S.W.2d 511, 512 (Mo. App. 1982); *Foundation Sav. & Loan Co. v. Rosenbaum*, 113 Ohio App. 501, 171 N.E.2d 359, 360 (1960); *Bailey v. Bailey*, 312 S.C. 454, 441 S.E.2d 325, 327 (1994). We are convinced that the authority of the court in a divorce action to divide property is simply ancillary to its authority to dissolve the marriage. The primary subject of a divorce action is the dissolution of the marriage, and the only proper parties to such an action are the spouses seeking to be divorced. *In re Marriage of Soriano*, 44 Wash. App. 420, 722 P.2d 132, 133 (1986).

*Olsen*, 247 P.3d at 81 (quoting *Nielson*, 982 P.2d at 712); *see also In re Marriage of*

*Heidema*, 152 P.3d 112, 115 (Mont. 2007) ("In a dissolution proceeding, the court has

authority to apportion marital assets only between the parties.").

In Maryland, the division of marital property in a divorce action is governed by the

doctrine of equitable distribution, not the doctrine of community property, and we are

persuaded that the Grandparents should not have been permitted to intervene to assert a

35

claim in this case. Although the Grandparents contributed money for the purpose of purchasing the house, they didn't take or retain any sort of ownership or security interest in it—their interest, whatever it is, lies against the Husband and Wife individually. That's why they fear the "windfall" that Wife would reap, in their view—if they can't capture the house sale proceeds directly, they will have to try and collect them from her and their son as individuals. But if the Grandparents were allowed to intervene here, it would be difficult to distinguish them in a principled way from other unsecured creditors of the divorcing parties, such as credit card issuers, and that is a Pandora's Box we decline to open judicially. The purpose of divorce proceedings is to sever the marital relationship and distribute the rights and responsibilities that grew out of it, such as the custody and support of children and the division of marital assets, *not* to facilitate the collection of marital debts by third parties. *See, e.g.*, *Boyle*, 459 S.E.2d at 405 ("The paramount goal in any divorce proceeding is a just and equitable resolution of the interests and rights of the divorcing spouses. The asserted interests of third parties in marital property are best resolved in legal actions separate and apart from divorce proceedings.") We hold, therefore, that the circuit court erred in considering and resolving the Grandparents' claim against the house sale proceeds, and we offer no views on whether the Grandparents have such a claim or on the merits of a claim if they have one.

**D.    The Circuit Court Did Not Err In Reimbursing Husband For "Contributions" He Made Toward Maintaining The Family Home.**

*Next*, Wife contests the circuit court's denial of her Motion For Partial Reconsideration Of The Final Order And Plaintiff's Motion For Expenses She Paid On

Defendant's Behalf Towards The Maintenance Of The Family Home, in which she "request[ed] compensation for her half of the expenses she paid towards the maintenance of the family home from the time the parties separated through October 2014, or in the alternative, that the respective contributions be set off against each other." Wife takes issue in particular with what she characterizes as the court's lack of any findings of fact or analysis.

"Generally, one co-tenant who pays the mortgage, taxes, and other carrying charges of jointly owned property is entitled to contribution from the other." *Gordon v. Gordon*, 174 Md. App. 583, 641 (2007) (quoting *Crawford v. Crawford*, 293 Md. 307, 309 (1982)). In *Crawford*, 293 Md. at 311, the Court of Appeals held that "a co-tenant in a tenancy by the entireties is entitled, to the same extent as a co-tenant in a tenancy in common or joint tenancy is entitled, to contribution for that spouse's payment of the carrying charges which preserve the property." We recognized in *Baran v. Jaskulski*, 114 Md. App. 322, 328 (1997), that *Crawford* "abolished the presumption of gift between separated spouses and permitted a spouse to seek contribution in those instances when married parties were not residing together and one of them, or the other, had paid a disproportionate amount of the carrying costs of property." We explained in *Baran* that separated spouses can recover contribution from the other for expenses relating to the marital home:

> Crawford Credits—the general law of contribution between cotenants of jointly owned property applies when married parties, owning property jointly, separate. A married, but separated, cotenant is, in the absence of an ouster (or its equivalent) of the nonpaying spouse, entitled to contribution for those expenses the paying spouse has paid.

37

*Id.* at 332.  "Because preservation of the property accrues to the benefit of the co-tenant, a tenant by the entirety may also be entitled to contribution for payments of the mortgage and taxes." *Gordon*, 174 Md. App. at 641.   Thus, "[c]ontribution is a factor that may be considered in making a monetary award . . . ." *Id.* (quoting *Broseus v. Broseus*, 82 Md. App. 183, 192–93 (1990)).  "On the other hand, a trial judge is not obligated to award such contribution between husband and wife at the time of a divorce."  *Id.* (quoting *Imagnu v. Wodajo*, 85 Md. App. 208, 223 (1990)).  And "the award of contribution is an equitable remedy within the discretion of the court."  *Id.* at 642 (citing *Keys v. Keys*, 93 Md. App. 677, 681 (1992)).

We disagree with Wife that the circuit court erred in awarding what essentially constituted *Crawford* credits.  Husband and Wife separated on May 30, 2013.   After separating, Wife stayed in the marital home with Child, and they lived with two different men shortly after the separation.  Beginning sometime around November 2013, Wife stopped paying the mortgage.  When the marital home was one day away from being put into foreclosure, Husband, with assistance from the Grandparents, paid the mortgage to prevent the foreclosure from going forward, all when Husband no longer lived there.  We see no abuse of discretion in the court's decision to award Husband, the sole party paying the mortgage on the house, contribution against those payments from Wife.

E.    **The Circuit Court Did Not Abuse Its Discretion In Awarding Child Support To The Grandparents.**

After the custody merits hearing and oral ruling, the court issued an interim order dated September 24, 2014 awarding the Grandparents sole legal and physical custody of

38

Child.  The interim order further ordered that Husband "shall pay Child Support in the amount of $500.00 per month for the minor child, commencing October 1, 2014 directly to the [Grandparents]" and "that the Assignment Office shall set a hearing before the Master to determine Child support payments to be made by [Wife]."

That hearing took place on March 1, 2015 before a magistrate.  Wife's counsel argued that child support had been addressed already, simultaneously with child custody, in the Final Order, which did not include an award of child support.  The Grandparents responded (perhaps ironically) that the Final Order did not override the interim orders that provided for a child support hearing, except to the extent that the second interim order specifically reduced Wife's access to the Child.  The Grandparents pointed out that the parties' income and Child's expenses had not yet been considered, and that child support could not have been considered during the custody merits hearing because the Grandparents had not yet been awarded custody.  The Grandparents also pointed to their earlier testimony to the effect that "that they could support [Child] in the normal fashion . . . , but [Child], unfortunately, had very high out-of-pocket expenses due to therapy, and psychological therapy."

At the hearing, the Grandparents offered the testimony from a pediatric and adolescent psychiatrist who, along with a psychologist, have been treating Child and will continue to do so for the foreseeable future.  The Grandparents offered evidence regarding Wife's and Husband's income, and the unreimbursed medical amounts they had paid for Child's treatment.  At the conclusion of the Grandparents' case, Wife's counsel moved for

judgment on the ground that the Grandparents failed to present any evidence of their incomes, and the magistrate denied the motion.

On March 24, 2015, the magistrate issued an oral recommendation. The magistrate found, among other things, that the Final Order was not a final judgment because it did not adjudicate all of the claims at issue, and ordered Husband and Wife to pay child support to the Grandparents because parents have a legal obligation to financially support their children. Using the Child Support Guidelines (the "Guidelines"), the magistrate awarded the Grandparents child support dating back to December 30, 2014, the date of filing, in the amount of $1,467 per month from Wife and $629 per month from Husband.

Wife filed Objections To The Family Law Magistrate's Recommendations Concerning Findings Of Fact And Conclusions Of Law ("Objections") on April 2, 2015. She argued that the Grandparents should not be awarded child support because the court did not award any child support to them in the Final Order after the custody merits hearing, the Grandparents voluntarily assumed the obligations of support, the child support award was "grossly excessive" and constituted 47% of Wife's gross salary, and the Grandparents are, in her words, "extraordinarily wealthy." In two separate orders entered on May 26, 2015, the circuit court denied Wife's Objections and granted the Grandparents' Motion for Child Support.

For purposes of this appeal, Wife refers us to her Objections and argues that "the order of child support . . . , payable to the wealthy [Grandparents], was not in accordance

40

with the appropriate child support provisions that did not take into account the parties' relative wealth."[11]  We disagree.

---

[11] The Grandparents argue in their brief that the circuit court's ruling should be affirmed because Wife didn't adhere to Rule 9-208(g)(1) when she failed to order a copy of the transcript of the hearing before the magistrate or cite to the record in her Objections.  Rule 9-208 states in pertinent part as follows:

> (f) Exceptions. Within ten days after recommendations are placed on the record or served pursuant to section (e) of this Rule, a party may file exceptions with the clerk. Within that period or within ten days after service of the first exceptions, whichever is later, any other party may file exceptions. Exceptions shall be in writing and shall set forth the asserted error with particularity. Any matter not specifically set forth in the exceptions is waived unless the court finds that justice requires otherwise.

> (g) Requirements for Excepting Party. At the time the exceptions are filed, the excepting party shall do one of the following: (1) order a transcript of so much of the testimony as is necessary to rule on the exceptions, make an agreement for payment to ensure preparation of the transcript, and file a certificate of compliance stating that the transcript has been ordered and the agreement has been made; (2) file a certification that no transcript is necessary to rule on the exceptions; (3) file an agreed statement of facts in lieu of the transcript; or (4) file an affidavit of indigency and motion requesting that the court accept an electronic recording of the proceedings as the transcript. Within ten days after the entry of an order denying a motion under subsection (g)(4) of this section, the excepting party shall comply with subsection (g)(1). The transcript shall be filed within 30 days after compliance with subsection (g)(1) or within such longer time, not exceeding 60 days after the exceptions are filed, as the magistrate may allow. For good cause shown, the court may shorten or extend the time for the filing of the transcript. The excepting party shall serve a copy of the transcript on the other party. The court may dismiss the exceptions of a party who has not complied with this section.

41

"A parent has both a common law and statutory duty to support his or her minor children," *In re Katherine C.*, 390 Md. 554, 570 (2006)—a principle which the magistrate judge in this case correctly noted. "The parents of the child, jointly and severally, have a responsibility and obligation to provide child support if they are capable of doing so." *Id.* at 571 (citing FL § 5-203(b)). The Guidelines define the monetary scope of that duty. *See* FL tit. 12; *Drummond v. State*, 350 Md. 502, 520–21 (1998); *Tannehill v. Tannehill*, 88 Md. App. 4, 11 (1991). "[T]he amount of a child support award is [ordinarily] governed by the circumstances of the case and is entrusted to the sound discretion of the trial judge," and that "determination should not be disturbed unless he has acted arbitrarily in administering his discretion or was clearly wrong." *Gates v. Gates*, 83 Md. App. 661, 663 (1990).

We see nothing in the statute or elsewhere to suggest that the guidelines should not apply when a third party has custody of a child and seeks child support from the non-custodial parents. Indeed, a parent has an obligation to pay child support to a custodial third party, *see Newkirk v. Newkirk*, 73 Md. App. 588, 596–97 (1988) (holding that divorced father continued to owe child support to his children's deceased mother's brother where she asked her brother to be the guardian of her minor children), and there is no reason to view the extent of the support obligation differently simply because the payee is someone other than the parent. *See* FL § 12-202(a) ("[I]n any proceeding to establish or

The Grandparents, however, did not raise this issue in the circuit court and there is no indication in the record, particularly in the court's order on the merits of Wife's Objections, that Wife did not provide a transcript with her Objections.

42

modify child support, whether pendente lite or permanent, the court *shall* use the child support guidelines set forth in this subtitle [§ 12-204]." (emphasis added)); *see also In re Katherine C.*, 390 Md. at 566 (applying the Guidelines where "the child support monies will go towards the reimbursement of State care"); *In re Joshua W.*, 94 Md. App. 486, 500 (1993) (concluding that "the General Assembly intended that these child support guidelines be used in all child support cases, including those, like the one at hand, involving government financed child care and no custodial parent"). Nor do we see any reason to deviate from the statutory list of financial considerations, *see* FL § 12-204 (adjusted income of the parents, child care expenses, extraordinary medical expenses, school and transportation expenses, and third-party payments, such as disability or retirement dependency benefits), and add consideration of the custodial third party's financial circumstances. The support obligations lie with the parents, not the Grandparents, and nothing about the Grandparents' means relieves (or should relieve) Wife of her obligations to the Child. We find no abuse of discretion in the court's decision to award child support to the Grandparents both from Wife and Husband, nor in the amount awarded.

**APPEAL DISMISSED IN PART. JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED AS TO THE DIVORCE PROPERTY DISTRIBUTION AWARD, AFFIRMED AS TO ALL OTHER RESPECTS. APPELLANT TO PAY 80% OF COSTS AND APPELLEE TO PAY 20%.**